**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| IN RE PEANUT FARMERS ANTITRUST LITIGATION | Case No.  2:19-cv-00463-RAJ-LRL |

**SECOND AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I.     NATURE OF ACTION ................................................................................... 1

II.    JURISDICTION AND VENUE .................................................................... 3

III.   PARTIES ...................................................................................................... 5

     A.    Plaintiffs ............................................................................................. 5

     B.    Defendants ......................................................................................... 6

IV.   AGENTS AND CO-CONSPIRATORS ......................................................... 7

V.    TRADE AND COMMERCE......................................................................... 8

VI.   FACTUAL ALLEGATIONS ........................................................................ 9

     A.    Background on the Peanut Production Industry ................................... 9

          1.    Peanut Production in the United States.................................... 9

          2.    Federal Peanut Policy and the Farm Bills............................. 10

          3.    Contract Marketing Under the Current Peanut Policy. .......... 11

          4.    Peanuts Are a Commodity. .................................................... 12

          5.    The United States Peanut Production Market is a National Market Worth Over a Billion Dollars Annually. .................................... 12

     B.    The Structure and Characteristics of the Peanut Shelling Market Render the Conspiracy Economically Plausible. ................................................. 12

          1.    The Peanut Market is Characterized by Inelastic Demand. ................... 12

          2.    There Are No Significant Substitutes for Peanuts. ................. 12

          3.    The Peanut Shelling Industry is Highly Concentrated and Has Experienced High Consolidation. .................................................... 13

          4.    The Peanut Shelling Industry is Characterized by a Lack of Pricing Transparency and Asymmetric Access to Key Market Information. ................................................................. 14

          5.    The Peanut Shelling Industry Relies on Market Data Provided Voluntarily and Confidentially by Shellers............................. 15

6.     The Peanut Shelling Industry and Golden Peanut's Parent Company Have Previously Been Investigated by the Government for Collusive Action...........................................................16

7.     Defendants Had Numerous Opportunities to Collude. ...........................17

8.     There Are High Barriers to Entry in the Peanut Shelling Market. ...................................................................................................22

C.     Despite Significant Market Changes, the Prices of Raw, Harvested Runner Peanuts Paid to Farmers Have Remained Low and Notably Stagnant Since 2014..........................................................................................23

D.     Birdsong and Golden Peanut Conspired With One Another to Manipulate USDA Data and Depress Prices Paid to Peanut Farmers. ...............................................................................................................27

VII.     CLASS ACTION ALLEGATIONS ...........................................................................30

VIII.     ANTITRUST INJURY .................................................................................................32

IX.     ACTIVE CONCEALMENT.........................................................................................33

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class") consisting of Peanut farmers in the United States who sold raw, harvested Runner Peanuts to Peanut shelling companies from at least January 1, 2014 through the present (the "Class Period").  Plaintiffs bring this action for treble damages under the antitrust laws of the United States against Defendants, and demand a trial by jury.

## I.    NATURE OF ACTION

1.      Peanut shelling companies (or shellers) play a vital role in the peanut production process.  The majority of Peanut crops are processed in some manner prior to reaching customers.  Once Peanut farmers harvest their crops, approximately 90% of the Peanuts are usually moved to a buying point and sold to a shelling plant.  Inside the shelling plant, the Peanuts are processed and packaged into sacks for shipment or storage.  The Peanut shellers are responsible for marketing and selling the shelled product to food companies or other manufacturers.

2.      As used in this Complaint, "Peanut" or "Peanuts" refers to all peanuts that are raw and harvested and ready to be sold to shellers.  "Peanuts" includes all four of the major types of peanuts: runner, Spanish, Valencia, and Virginia.

3.      As used in this Complaint, "Runner," "Runners," or "Runner Peanuts" refers to the runner type of peanuts that are raw and harvested and ready to be sold to shellers.

4.      Defendants Birdsong Corporation ("Birdsong") and Golden Peanut Company, LLC ("Golden Peanut") are the two largest players in the shelling industry in the United States and together hold 80-90% of the total Peanut shelling market share.  Defendant Olam Peanut Shelling Company, Inc., f/k/a McCleskey Mills, Inc. ("Olam" and together with Birdsong and Golden Peanut, "Defendants") is the third largest participant in the United States Peanut shelling industry and holds at least 10% of the total Peanut Shelling market share.

5.     Since January 2014, the prices paid by shellers to Peanut farmers for Runners have remained remarkably flat and unchanged, despite significant supply disruptions such as Hurricane Michael, a Category 5 hurricane that hit a significant amount of Peanut crops in the Florida panhandle/southern Georgia and Alabama area in 2018.

6.     From 2011 to 2013, the Peanut industry experienced drastic weather-related price changes that made it difficult for Defendants and McCleskey Mills (now known as Olam) to manage risk and plan for production.  Upon information and belief, and as alleged in this Complaint, Defendants and McCleskey Mills thereafter conspired and colluded with one another to stabilize and depress Runner prices.  Among other things, during the relevant time period, Defendants over-reported Peanut and Runner inventory numbers to the USDA to create the false impression of an oversupplied market.  Defendants capitalized on the perceived oversupply to offer artificially low Runner prices to farmers.  Defendants also under-reported Peanut and Runner prices to the USDA to further suppress prices and keep them low and less volatile.

7.     In addition, Defendants offered nearly identical shelling contracts, often within the same day of one another, limiting the negotiating power and pricing options for farmers.  Upon information and belief, these contracts are released following National Peanut Buying Points Association conferences, which are sponsored and attended by Golden Peanut, Birdsong, and Olam.

8.     The Peanut shelling industry is particularly susceptible to a conspiracy due to a lack of pricing transparency.  Unlike other agricultural commodities, there is no futures market for Peanuts.  Rather, Peanut prices are set through private contracting between shellers and farmers, although farmers rarely have negotiating power over contractual terms.  As the dominant players in this industry, Defendants dictate the prices offered to Plaintiffs and Class members.

9.      Defendants' shelling facilities and the buying points they control through various contractual arrangements are scattered throughout key United States Peanut production regions and located in close proximity to one another, providing prime opportunities for collusion. Defendants are heavily involved in the industry's top trade associations through which they discuss and share exclusive market information.

10.      Defendants' wrongful and anticompetitive actions had the intended purpose and effect of artificially fixing, depressing, maintaining, and stabilizing the price of Runners to Plaintiffs and Class members in the United States.

11.      The effect of Defendants' conspiracy has been devastating to many farmers.  Unlike prior to the conspiracy, there are no longer good price years to balance out the now-common bad years of Runner prices.  This has led numerous farmers to borrow from generations of equity built up in their land, relying on that equity to pay themselves and keep their farms running.  The consequence is smaller farmers being run out of business as they use up the remaining equity in their farms.

12.      As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class were artificially underpaid for Runners during the Class Period.  Such prices were below the amount Plaintiffs and the Class would have been paid if the price for Runners had been determined by a competitive market.  Thus, Plaintiffs and Class members were directly injured by Defendants' conduct.

## II.      JURISDICTION AND VENUE

13.      Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustain by Plaintiffs and the members of the Class by

virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations.

14.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

15.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c), and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

16.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) purchased substantial quantities of Runners and sold the shelled product throughout the United States, including in this District; and/or (c) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

17.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

18.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.    PARTIES

**A.    Plaintiffs**

19.    Plaintiff D&M Farms is a Florida partnership that sold Runners to Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

20.    Plaintiff Mark Hasty is a resident of Florida and citizen of the United States.  Mr. Hasty is a Peanut farmer who sold Runners to Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

21.    Plaintiff Dustin Land is a resident of Florida and citizen of the United States.  Mr. Land is a Peanut farmer who sold Runners to Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

22.    Plaintiff Rocky Creek Peanut Farms, LLC is an Alabama limited liability company that sold Runners to one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

23.    Plaintiff Daniel Howell is a resident of Alabama and citizen of the United States. Mr. Howell was a Peanut farmer who sold Runners to one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

24.    Plaintiff L&K Farms Group, LLC is a Florida limited liability company that sold Runners to one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

25.    Plaintiff Lonnie Gilbert is a resident of Florida and citizen of the United States. Mr. Gilbert is a Peanut farmer who sold Runners to one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**B.    Defendants**

26.    Defendant Birdsong Corporation is a Virginia corporation headquartered in Suffolk, Virginia.  Birdsong purchases Runners directly from farmers, and then cleans, shells, and sizes the Runners to sell to food manufacturers.  Birdsong operates six shelling plants throughout Virginia, Georgia, and Texas.   Birdsong also operates eighty-five buying points throughout Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Arkansas, Oklahoma, and Texas.

27.    Defendant Golden Peanut Company, LLC is a Georgia limited liability company headquartered in Alpharetta, Georgia and registered to conduct business in Virginia.  Golden Peanut is a leading Peanuts and tree nuts sheller with shelling plants in Georgia, Texas, and internationally.  Golden Peanut also maintains more than 100 buying points.  Golden Peanut is a wholly-owned subsidiary of Archer Daniels Midland Company ("ADM"), a public corporation and one of the world's largest agricultural processors and food ingredient providers.  As discussed further below, ADM has a history of price-fixing, and paid $100 million (the largest fine ever at the time in 1996) for a global conspiracy to eliminate competition in the food and feed additive industries.

28.    Defendant Olam Peanut Shelling Company, Inc. is a Georgia corporation headquartered in Fresno, California.  Olam is the third largest Peanut sheller in the United States with shelling plants in Georgia and Alabama.  Olam also maintains roughly two dozen buying points.  Olam is a wholly-owned subsidiary of Olam International Limited ("OIL"), a leading agri-business operating in 60 countries and headquartered and listed in Singapore.  On December 5, 2014 OIL announced that it had signed a purchase agreement to acquire a 100% interest in McCleskey Mills, Inc. for $176 million, the third largest peanut sheller headquartered in Smithville, Georgia which maintained a 12% market share at the time.  On June 9, 2016 OIL

announced that it acquired a 100% interest in Brooks Peanut Company, LLC for $85 million, the sixth largest peanut sheller in the United States at the time based in Samson, Alabama. On December 27, 2018, Brooks Peanut Company, LLC and McCleskey Mills, Inc. were merged, and the corporate name was changed to Olam Peanut Shelling Company, Inc. Olam is liable for its own actions during the Class Period and also for the acts of McCleskey Mills, Inc. and Brooks Peanut Company, LLC, its predecessor companies.

29.    "Defendant" or "Defendants" as used herein includes, in addition to those named specifically above, all of the named Defendants' predecessors, including peanut shelling companies that merged with or were acquired by the named Defendants and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that purchased Runners in interstate commerce, directly or through its wholly-owned or controlled affiliates, from peanut farmers in the United States during the Class Period.

30.    To the extent that subsidiaries and divisions within each Defendant's corporate family purchased Runners from Peanut farmers, these subsidiaries played a material role in the conspiracy alleged in this Complaint because Defendants wished to ensure that the prices paid for such Runners would not undercut the artificially depressed pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in purchasing and pricing with regard to Plaintiffs and members of the Plaintiff Class for Runners was known to and approved by their respective corporate parent named as a Defendant in this Complaint.

## IV.    AGENTS AND CO-CONSPIRATORS

31.    Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in

furtherance of the conspiracy.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

32.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

33.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

34.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V.    TRADE AND COMMERCE

35.     During the Class Period, each Defendant, directly or through its subsidiaries or other affiliates, purchased Runners and sold the shelled product in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

36.     During the Class Period, Defendants collectively controlled a majority of the market for Peanut shelling in the United States.

37.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected interstate trade and commerce throughout the United States and caused antitrust injury to Plaintiffs and members of the Class.

## VI.    FACTUAL ALLEGATIONS

**A.    Background on the Peanut Production Industry**

**1.    Peanut Production in the United States.**

38.    There are four major types of Peanuts grown in the United States: Runner, Spanish, Valencia, and Virginia.   The type of Peanut grown is region-specific: Runners are grown throughout the country, but especially in Georgia, Alabama, Florida, Texas, and Oklahoma; Spanish Peanuts are primarily grown in Oklahoma and Texas; Valencia Peanuts are primarily grown in New Mexico; and Virginia Peanuts are primarily grown in Virginia, North Carolina, and South Carolina.   The Runner type is the primary commercial Peanut raised, and makes up approximately 80% of the United States' planted acreage.   As a result, this Complaint focuses on Runner Peanuts, although Defendants' conspiracy may also involve the other Peanut types; Defendants are just as active in purchasing Spanish and Virginia Peanuts as they are with runner Peanuts.  Plaintiffs' investigation continues.

39.    Peanut production in the United States is concentrated in the Southeast (Alabama, Florida, Georgia, Mississippi, South Carolina), the Southwest (New Mexico, Oklahoma, Texas), and the Mid-Atlantic (Virginia and North Carolina).

40.    Peanuts are produced either on irrigated land or dry land.   Irrigated Peanuts, also known as premium Peanuts, are less risky crops than dry-land Peanuts because the yield is more certain, whereas dry-land Peanuts are more susceptible to drought conditions.   As reported in 2016, however, only 25% of United States Peanut acreage is irrigated due to limited land with water available for irrigation.   For example, southern Georgia and northern Florida have a higher percentage of irrigated Peanuts due to a large aquifer in the region.

41.    The growing cycle of the Peanut, from planting to harvesting, takes approximately four to five months.   The crops are planted after the last frost of the year, usually in April or May.

When Peanuts are ready for harvest during the fall, farmers pull the plants out of the ground to dry and collect the nuts.  Once that is completed, the Peanuts are ready to be delivered to buying points and sold to shellers.

42.     Buying points typically are either independent entities who contract exclusively with one sheller, or are owned by a sheller.  Buying points act on a sheller's behalf to facilitate transactions with farmers, but buying points do not take title to the Peanuts and have no pricing authority; instead, buying points simply convey to farmers Peanut prices set by shellers.  Farmers deliver their Peanuts to buying points where the Peanuts are cleaned, graded, and delivered to shelling plants.  The Peanuts must be delivered to buying points immediately after harvest to prevent the Peanuts from rotting.

43.     As noted above, shellers play a vital role in the peanut production process.  Peanut shelling involves breaking the outer hull or shell of Peanuts and removing the kernels.  Approximately 90% of harvested Peanuts are sold to shellers to be processed and packaged for food companies or other manufacturers, such as Hershey Co., Mars, Inc., and Jif.

**2.     Federal Peanut Policy and the Farm Bills.**

44.     Peanut farmers face higher than normal farming risks and have limited information with regard to price discovery because there is no futures market.  In addition, there are the typical agricultural risks that affect the success of a Peanut crop harvest, with weather (such as floods or droughts) being the primary risk factor.  Other risks include pests, new technology, machinery efficiency, and the availability, quality, and efficacy of inputs.

45.     The federal government has provided some risk management and funding options for Peanut farmers.  From the 1930s to 2002, the Peanut industry operated under a system of marketing quotas that controlled domestic supplies and prices.  In 2002, Congress eliminated the quota system under the Farm Security and Rural Investment Act (the "2002 Farm Bill") such that

farm policy for Peanuts followed essentially the same structure as other covered commodities—fundamentally changing the Peanut industry to become more market-oriented.  The 2002 Farm Bill provided a marketing loan rate of $355 per ton for all Peanuts, creating more competition among farmers without restricting the supply by favoring just the quota holders.

46.     In 2014, Congress enacted the Agricultural Act of 2014 (the "2014 Farm Bill"), which introduced additional modifications to Peanut payment programs and governs the majority of current Peanut policy.[1]  Under the current policy, there are three types of financial support for Peanut farmers.  At a general level, the current policy offers loans guaranteed by the farmer's crop so that the government can repossess Peanuts as repayment if the farmer is unable to sell all of it.  The current loan rate for Peanuts, including Runners, is approximately $355 per ton, which has remained the same since the 2002 policy.  This loan program essentially provides a price floor because the government takes ownership of the crop if prices drop below the statutory loan rate.

### 3.     Contract Marketing Under the Current Peanut Policy.

47.     After implementation of the 2002 Farm Bill, private contracting became the standard for Peanut transactions between farmers and shellers.  Option contracts are the most commonly used type of contracts.  Shellers use option contracts to manage risk and hedge against poor crop years, by obtaining an exclusive option in advance to purchase Peanuts from farmers for a specific type and amount.  Shellers pay an option price above the government loan rate for the right to purchase Peanuts, and farmers can pocket that premium.  In theory, option contracts may differ among shellers with regard to payment specifications, such as when payment is received, how many tons are farmed, the right to purchase additional Peanuts, and shrink and storage options.

---

[1] In 2018, Congress enacted another Farm Bill, but the 2018 Farm Bill for the most part left critical Peanut provisions in place and did not significantly impact federal peanut policy.

In practice, however, the contracts tend to be similar for each transaction, as farmers merely receive pre-printed forms to complete and sign.

### 4.    Peanuts Are a Commodity.

48.    Within each type (such as Runners), Peanuts are commodity products with little to no product differentiation among growers, as recognized by the USDA and the Agricultural Marketing Resources Center.  After harvesting, Runners from different farmers are co-mingled and stored together at buying point warehouses; there is no need to separate Runners based on the grower.

### 5.    The United States Peanut Production Market is a National Market Worth Over a Billion Dollars Annually.

49.    Peanuts are the twelfth most valuable cash crop grown in the United States, with a farm value averaging $1.1 to $1.4 billion U.S. dollars annually.

### B.    The Structure and Characteristics of the Peanut Shelling Market Render the Conspiracy Economically Plausible.

### 1.    The Peanut Market is Characterized by Inelastic Demand.

50.    Consumer demand for peanuts and peanut products is relatively unaffected by price because peanuts are historically considered to be an inexpensive good, even when prices fluctuate, comprising a small share of consumers' budgets.  This inelasticity is a critical long-running factor that influences Peanut output such that even small changes in supply can result in large price fluctuations.

### 2.    There Are No Significant Substitutes for Peanuts.

51.    There are no significant substitutes for Peanuts.  Although there are potential substitute products, such as soybeans, sunflower seeds, almonds, cashews, or other tree nuts, the characteristics of those products lack the unique characteristics of peanuts.  Peanuts are distinctive in that they can be both consumed and processed into other foods, from peanut butter to candies.

Peanuts also have more protein than any other nut, making peanuts a unique source of nutrition. Peanuts are an inexpensive protein upon which many consumers in the U.S. rely.  Moreover, Peanuts can be processed for industrial uses, such as paints, plastics, and fuel.

**3.      The Peanut Shelling Industry is Highly Concentrated and Has Experienced High Consolidation.**

52.      The concentration of shellers has significantly increased over the past fifty years as non-farm sectors of the industry consolidated to promote higher efficiency.  The USDA reported in 2016 that Peanut farmers operate in a thin market with a very small number of shellers, sometimes facing no options at all because there is only one potential buyer available for their region.  In 1970, there were 92 active shelling companies, a stark contrast from the two very large and roughly one dozen other small shellers that exist today.  At least five of these smaller shellers are family or farmer-owned businesses that are limited to a single processing facility.  Another two of these shellers, Severn Peanut Company and Southern Peanut Company, operate their own food production labels and shell primarily, if not exclusively, for their own food labels.

53.      There are currently only two major shellers, Defendants Birdsong and Golden Peanuts.  Between 2000 and 2003, Defendants controlled approximately 73% of all Peanuts purchased for shelling and two-thirds of all buying points.  Currently, Defendants Birdsong and Golden Peanut together control 80-90% of the United States Peanut shelling market.  Defendant Olam is the third largest participant in the United States Peanut shelling industry and controls at least 10% of the United States Peanut shelling market.

54.      There have been several acquisitions by major companies and industry players in the past five years.  Since the 1950s, Defendant Golden Peanut (previously known as Gold Kist Peanuts) has acquired various shelling plants and peanut mills.  In 1992, Golden Peanut purchased Dothan Oil Mill (also known as Domco), one of the key shelling companies at the time.  In 2015,

Golden Peanut acquired Clint Williams Company (also known as Texoma Peanut Company) after Clint Williams filed for bankruptcy.  The bankruptcy threatened to cripple the Peanut industry in Texas, Oklahoma, Arkansas, and Mississippi until the USDA paid out affected farmers for their lost Peanuts.

55.     As mentioned above, in 2014, Defendant Olam's ultimate parent company OIL announced it would acquire McCleskey Mills, Inc., the third largest peanut sheller in the United States at the time and in 2016, OIL acquired Brooks Peanut Company, the sixth largest Peanut sheller in the United States at the time.  On December 27, 2018, Brooks Peanut Company, LLC and McCleskey Mills, Inc. were merged, and the corporate name was changed to Olam Peanut Shelling Company, Inc. These recent acquisitions have strengthened Olam's position as the third largest Peanut sheller in the U.S., with a market share of at least 10%.

**4.     The Peanut Shelling Industry is Characterized by a Lack of Pricing Transparency and Asymmetric Access to Key Market Information.**

56.     Because there is no futures market or public exchange for buying and selling Peanuts, price discovery is difficult.  The use of private contracts in the industry means there is no true market price.

57.     Large shellers hold an advantage over individual farmers because the shellers have easier access to resources and market information.  A 2004 study found that the persistence of price transmission asymmetry suggests firms in the industry, including shellers, "have been behaving collusively over time, which shifted…gains from input price decreases from consumers and producers to the processors."  Defendants, as three of the largest Peanut shellers in the country, have an extensive network of data to draw from for pricing, supply, and demand projections.  As discussed further below, Defendants are also members of exclusive trade associations where they

can exchange specialized information with competitors and otherwise work closely with one another to influence the Peanut shelling industry.

58.     Individual farmers are more geographically dispersed than shellers and do not have similar opportunities or resources to negotiate fair Peanut prices.  Farmers generally base their planting decisions and expected prices on their contractual terms with shellers set each spring before they plant their crops.

**5.     The Peanut Shelling Industry Relies on Market Data Provided Voluntarily and Confidentially by Shellers.**

59.     Every week, the National Agricultural Statistics Service ("NASS"), a USDA agency, publishes the prices of Peanuts paid to farmers.  NASS publishes prices for each category of Peanuts, including Runners, and these prices are used by the USDA (along with other information) to help establish a weekly market estimate known as the National Posted Price ("NPP").  The Farm Service Agency ("FSA") also relies on NASS prices to determine the amount of federal financial assistance for farmers, so that even small changes in Peanut prices can significantly affect that assistance.

60.     In 2009, the USDA Office of Inspector General published an audit of the NASS Peanut prices on the Department of Justice Antitrust Division's website, finding the NASS price data was "incomplete, outdated, and unverifiable."  The USDA revealed that the NASS solicits the price data from shellers, whose participation is voluntary and confidential by law.  NASS has no authority to verify the price data reported by the Peanut shellers.  When the USDA contacted shellers during its audit, only two smaller shellers responded—all of the other shellers in the market declined the USDA's request.

61.     The USDA also found the NASS prices may not accurately reflect nationwide prices due to the forward-looking nature of the option contracts that govern Peanuts transactions

between shellers and farmers.  NASS data reflects the prices that were contractually established months earlier.  As an illustration, the audit revealed that a contract signed in February 2007 was for $415 per ton of Peanuts, but during that same week the contract was signed, the NASS price was $340 per ton, a difference of $75 per ton.  At the time the option contract was exercised later in the year (at the agreed upon $415 per ton), the NASS price was actually $437 per ton.

62.    Since the 2009 audit, NASS has only implemented minor changes to its data gathering method for Peanut prices, and proposed NASS changes are submitted to the American Peanut Shellers Association, the oldest organized trade association in the shelling industry, for feedback.  The NASS prices are still gathered from shellers on a voluntary and confidential basis. Because the USDA audit concluded that the NASS prices would remain "vulnerable to errors and omissions" unless there is a system of mandatory reporting and verification, the current NASS Peanut prices likely still do not accurately reflect the prices farmers are paid for Peanuts.

63.    NASS also publishes a Peanut Stocks and Processing report every month for Peanut inventory levels at shelling plants and other such storage warehouses.  This data is available for each type of Peanut as well, including Runners.  Like with NASS Peanut prices, NASS inventory data is gathered from shellers on a voluntary and confidential basis, rendering the data susceptible to inaccuracy or manipulation.  For example, in July 2016, the NASS Peanuts Stocks and Processing report overstated the Peanut supply by more than 750,000 tons, a difference that was considered substantial.  Upon discovery of the substantial overstatement, the USDA later announced the overstatement and revised its prior reports from 2016.

**6.    The Peanut Shelling Industry and Golden Peanut's Parent Company Have Previously Been Investigated by the Government for Collusive Action.**

64.    In 1972, the United States Department of Justice filed two civil antitrust actions, one against the Southeastern Peanut Association (currently known as the American Peanut Shellers

Association) and one against the Southwestern Peanut Shellers Association.  The Department of Justice alleged the associations and their member shellers conspired with one another to fix commission rates paid to brokers who facilitated sales of peanuts after they were shelled.  In addition, the Department of Justice alleged the associations and their member shellers conspired to establish uniform terms for the sale of the shelled peanuts and refuse to deal with certain brokers. The Southwestern Peanut Shellers Association case was settled, with the association and shellers enjoined from price-fixing broker fees and ordered to submit annual reports describing their efforts to comply with the final judgment, among other requirements.

65.     In 1996, ADM, the parent company of Defendant Golden Peanut, pled guilty to antitrust violations and paid the largest fine ever at the time of $100 million for its role in a global conspiracy to eliminate competition in the food and feed additive industries.  In addition, ADM's senior-most executives were sentenced to prison in 1999 and ordered to pay the maximum fines under antitrust law.   Federal law enforcement officials called ADM's conduct "shameful;" according to then Attorney General Janet Reno, the massive fine "should send a message to the entire world" because "[i]f you engage in collusive behavior that robs U.S. consumers, there will be vigorous investigation and tough, tough penalties."

**7.     Defendants Had Numerous Opportunities to Collude.**

**a.     Geographic Proximity**

66.     The close proximity of Defendants and other Peanut shelling co-conspirators provided ample opportunities to meet and discuss pricing of Runners.  All three Defendants have operations in Georgia.  Golden Peanut's Blakely, Georgia facility is located less than a mile from Olam's pre-cleaning, re-milling and blanching lines and just across the highway from Birdsong's Southeast Area Headquarters.  All three Defendants also have operations in Texas.  Birdsong's Southwest Area Headquarters in Brownfield, Texas is located approximately 24 miles from

Golden Peanut's Seagraves, Texas facility.  Olam operates peanut processing lines in Dublin, Texas, less than 10 miles from Golden Peanut's Comyn, Texas Peanut shelling facility and less than 20 miles from Birdsong's warehousing facilities in Gorman, Texas.

67.     The United States Peanut production industry is also geographically concentrated in the Southern region of the country, with Alabama and Georgia ranking among the top three states in Peanut production.  Defendants have significant presence throughout the southern United States.  Both Birdsong and Golden Peanut have shelling plants and buying points in at least Alabama, Arkansas, Georgia, Mississippi, and Texas.  Olam has shelling plants and buying points in at least Alabama, Georgia, and Texas.

### b.     Trade Associations

68.     Defendants are members of the American Peanut Shellers Association, the American Peanut Council, and the Peanut and Tree Nut Processors Association.  Membership in these top trade associations provide important opportunities for Defendants to meet and collude with one another.

69.     The American Peanuts Shellers Association ("APSA") is the oldest organized group in the Peanut industry and is composed of commercial Peanut shellers and crushers in Alabama, Florida, and Georgia.  The APSA currently has eight sheller members, including Defendants Birdsong, Golden Peanut, and Olam.  Another APSA member, Damascus Peanut Company, operates as one of Birdsong's shelling plants.  Together, these four members hold nearly all of the market for Peanut shelling.

70.     The APSA President for the 2019-2020 term is Jamie Brown, the Senior Director and head of U.S. Peanut Shelling Operations at Olam.  The 12-member Board of Directors includes Olam's Chad Chandler, Bill Marshall, and Anupam Jindel, along with Gerald Garland and Greg Harnish from Birdsong, and Grant Belden, Brent Cuddy, Jimmy Dorsett, and Clint Piper from

Golden Peanut.   Numerous senior executives from Defendant Olam serve on various APSA committees with Defendant Birdsong's and Defendant Golden Peanut's officers and employees. For example, the 19-member Committee on Operations & Research includes three Olam employees, with the majority of the remaining committee members being employees of Birdsong or Golden Peanut.

71.    According to its website, the "primary purpose of the American Peanut Shellers Association is to promote the common interests of those engaged in the peanut shelling industry and more particularly, those in the southeastern states."   Further, "the Association provides a unified base and forum for members working closely together to advance the industry, both at home and abroad.   We provide information to all of our members as well as a multitude of items to aid them in marketing and sales."

72.    The American Peanut Council ("APC") serves as the "umbrella trade association representing ALL segments of the U.S. peanut industry."   The APC provides a forum "to exchange, share and process information" and connects its members with "specialized information in the peanut industry to help position and leverage [their] business for success."   APC members receive frequent media summaries and newsletters, publications and position statements, information on Peanut prices, U.S. export statistics, and other data.   The APC holds an annual three-day Winter Conference to discuss industry issues and strategies, which includes various committee and sheller meetings and networking hours.

73.    The Peanut and Tree Nuts Processors Association ("PTNPA") is an association of leading nut industry companies and representatives.   The PTNPA was originally established to focus solely on Peanuts and peanut butter, but now represents companies involved in all nut types to "serve[] as a powerful and highly professional network" and "provide timely information to [its]

members" "created by the combined experience, expertise, commitment and relationships represented by the sum of all PTNPA Members." The PTNPA describes its members as having "much in common and fully recogniz[ing] that 'we are all in this together.'" The PTNPA holds a four-day Annual Convention consisting of various presentations and commodity workshops on the nut industry, as well as numerous networking events such as Sunday brunch, dinner outings, desert Jeep tour, football viewing party, and golf and tennis tournaments. Defendants have been active sponsors and/or attendees of the PTNPA Annual Convention.

74.    Defendants each have executives who have served on the APC and PTNPA Board of Directors. David Birdsong of Defendant Birdsong was on the APC Board of Directors from at least 2016 to 2017, and currently serves on the PTNPA Board of Directors. Charles Birdsong of Defendant Birdsong served as the Secretary and Treasurer of APC from at least 2016 to 2017. Kaye Smith of Defendant Golden Peanut currently serves on the PTNPA Board of Directors. Greg Mills and Grant Belden of Defendant Golden Peanut also served on the APC Board of Directors from at least 2016 to 2017. Joe West and Chad Chandler of Defendant Olam (McCleskey Mills) both served on the APC Board of Directors from at least 2016-2017. David Birdsong and Sonny Duell of Defendant Birdsong, Alex Izmirlian of Defendant Golden Peanut, and Joe West of Defendant Olam (McCleskey Mills) also served on the 2016-2017 APC Export Division Board of Directors.

75.    Each year, the APSA and APC hold a joint meeting known as the USA Peanut Congress. The USA Peanut Congress is a four-day event composed of various committee and board meetings, presentations on economic updates and marketing trends, receptions, and a golf tournament. The APSA describes the event as "the largest meeting of all segments in the peanut industry" and "an opportunity to meet and discuss affairs with key industry figures worldwide."

On average, approximately 300 to 400 people attend the event, and both Defendants have been active sponsors, attendees, and presenters at the USA Peanut Congress.

76.     Defendants are also investors in The Peanut Institute, a non-profit organization founded by shellers to promote peanut consumption. The Peanut Institute serves to "support[] nutrition research and develop[] educational programs to encourage healthy lifestyles that include peanuts and peanut products." For the 2014-2015 period, Defendants together held nine of the thirteen Board of Trustees positions of The Peanut Institute. In addition, Dr. Darlene Cowart of Defendant Birdsong and Kris Lutz of Defendant Golden Peanut served as Chairman and Vice Chairman, respectively, of the Board of Trustees. Today, Defendants hold twelve of the seventeen Board of Trustees positions of The Peanut Institute, four of the seven Executive Committee positions, and four of the nine Marketing Committee positions. In addition, Defendants dominate the institute's leadership positions, with Dr. Darlene Cowart of Birdsong and Ali Hill of Golden Peanut serving as the Chairman and Vice-Chairman for The Peanut Institute Board of Trustees, Executive Committee, and Marketing Committee, and Charles Birdsong of Birdsong serving as the institute's Development Chairman. Jeff Johnson, now retired after working for Birdsong since 1974, helped found The Peanut Institute and served as its president during the institute's first three years.

77.     Defendants commission and are otherwise active with the National Peanut Buying Points Association ("NPBPA"), which represents the more than 350 buying points in the country. The association encourages membership so that "[u]nited we can become a force and have a seat at the table when decisions are made." Members receive Peanut market and industry information, lobbying representation, and access to educational conferences and leadership programs. For the 2017-2018 period, for example, David Rushing of Defendant Birdsong, Albert Rogers of

Defendant Golden Peanut and Chad Chandler of Defendant Olam (McCleskey Mills) ( each served on NPBPA's Board of Directors.

### c.   Direct Communications

78.     Defendants routinely talk with each other by phone.  A preliminary review of Birdsong and Golden Peanut telephone records show over 300 calls between phone numbers belonging to Defendants Birdsong and Golden Peanut and numbers belonging to employees of Defendant Olam.  These include phone calls lasting from 9 to 19 minutes to the cell phones of Olam's Senior Vice President Joe West and Vice President of Procurement Chad Chandler.

79.     Preliminary discovery also shows that Defendants regularly communicated directly with one another about the price paid and/or to be paid to Peanut farmers for Peanuts.

### 8.     There Are High Barriers to Entry in the Peanut Shelling Market.

80.     There are significant barriers to entering the United States Peanut shelling market. The primary barriers to entry are capital cost, risk, and market concentration.  A new entrant faces a costly startup requiring significant financial investment and industry resources.

81.     Peanut shelling requires a large, multi-million dollar financial investment for a new plant, infrastructure, and inventory.  Funding these costs is not always feasible for those new to the market.  A new entrant typically would need to raise substantial capital through a variety of carefully considered means, including selling shares, borrowing from multiple banks, and taking advantage of government tax credit programs, such as programs incentivizing community development in low-income areas.  Extensive feasibility studies are also important to help assess the economic viability of a new shelling venture, especially given the concentration of the industry.

82.     Farmer-owned cooperative shelling plants are not a significant competitive challenge to shellers as large and as dominant as Defendants, since such cooperatives face doubled risks of economic losses in the case of weather disasters and other catastrophic events.  As a result,

cooperative shelling plants only shell irrigated Peanuts rather than dry-land Peanuts because, as discussed above, there is less risk involved in growing irrigated Peanuts. No rational farmer would invest the money for dry-land Peanut shelling cooperatives as a significant competitive alternative to large shellers such as Defendants.

83.     Peanut shellers also need buying points. As noted previously, buying points serve a crucial role in facilitating transactions between farmers and shellers and must be strategically located near Peanut farms so that the Peanuts do not rot after harvest. Defendant Birdsong owns or contracts with over eighty-five buying points, Defendant Golden Peanut owns or contracts with more than 100 buying points, and Defendant Olam owns or contracts with roughly two dozen buying points to provide flexibility in supply, transportation, and delivery. The high number of buying points across different states allows these shelling companies to have multiple locations and access to a higher number of farmers.

84.     It can also be difficult for a potential new entrant to obtain buying points because contracts between buying points and shellers are exclusive and usually last for a term of three years; for instance, a buying point that has contracted with one shelling company cannot contract with another shelling company during the contracted term, such as with a new entrant.

85.     Finding and obtaining appropriate buyers is another challenge in the Peanut shelling industry. New Peanut shellers face difficult competition against large, already established shellers to contract with buyers.

C.     **Despite Significant Market Changes, the Prices of Raw, Harvested Runner Peanuts Paid to Farmers Have Remained Low and Notably Stagnant Since 2014.**

86.     As discussed above, the USDA estimates and announces a weekly NPP for Peanuts. The NPP is used to determine the government loan rate and other such benefits. The NPP is not the actual price that shellers pay to farmers, but is an estimate of the market price based on factors

such as shelled prices, international bids, and in-shell NASS prices.  The exact formula used to calculate the NPP is not publicly available.

87.    Since 2014, the NPP has remained notably unchanged.  As seen in the two graphs below, the only changes in the NPP for Runners during the past five years were in February to March 2014 and in August 2015, which contrasts the regular price fluctuations seen in the prior years:



**Source:** Data from Farm Service Agency, USDA

**Notes:** Posted price data are for Runner-type peanuts, with an average loan rate during entire period (August 2002-September 2016) of $355 per ton. During periods of weak market prices marketing assistance loan benefits have resulted, including $49 million for crop year 2002/03 and $31 million for crop year 2005/06.



88.     Market factors such as weather, tariffs, cost of production, and changes in demand fail to explain the low and stagnant Runner prices since 2014.  For instance, in 2016, a combination of floods and droughts reduced average Runner inventory by almost 100,000 tons.  Heavy rains and floods from Hurricane Matthew in October 2016 affected Runners in North and South Carolina because most of the crop had not yet been harvested when the hurricane hit.  Droughts in the southeast severely affected production in Georgia and Alabama.  Despite this decrease in supply leading into 2017, the NPP for Runners in 2017 hardly fluctuated, which sharply contrasts with the steep price increase from 2011-2012 when there was a similar level of decreased inventory due to a very dry, record hot summer in 2011.

89.     The tariffs that China recently implemented on U.S.-grown peanuts would not have contributed to the depressed prices.  China has only recently become a significant market for U.S. peanut exports in 2016 and 2017 when Chinese demand began to outpace China's domestic production.  Regardless, over 80% of U.S. peanut exports are still to Canada, Mexico, and Europe.  Any effects from Chinese tariffs would cause a minimal disruption to U.S. Peanut (and Runner) prices.  If anything, the increased Chinese demand for U.S. peanuts should have contributed to a

price increase in 2016 because of the limited production that year as discussed above while sales to China in 2016 increased eight-fold from the previous year.  Yet, Runner prices in 2016 do not reflect this phenomenon.

90.    Despite the flaws in NASS reporting discussed above, the NASS data also reveals Runner prices paid to farmers since 2014 have remained low and stagnant compared to the much more volatile prices of previous years that had been the norm since the 2002 Farm Bill:



In fact, *The Peanut Grower* publication recently reported in July 2019 that average Peanut prices paid to farmers have "decreased to the lowest price[s] in modern history."

91.    Similarly, despite its reporting flaws, NASS data for Runner inventory nonetheless tracks the various market factors affecting supply levels in the recent years:



The NASS inventory data also reveals Runner supply levels since 2014 have remained high (with the exception of 2012's record harvest), which is consistent with the NASS price data and the NPPs indicating farmers have been receiving lower Runner prices compared to the years before 2014.

**D. Birdsong and Golden Peanut Conspired With One Another to Manipulate USDA Data and Depress Prices Paid to Peanut Farmers.**

92.     On information and belief, Defendants Birdsong, Golden Peanut and Olam conspired and colluded to fix prices for Runners purchased from farmers in the United States market beginning in at least January 2014.

93.     Defendants and McCleskey Mills (now known as Olam) saw the need to stabilize and depress Runner prices after the Peanut market experienced a record drought year and production shortage in 2011, followed by a record harvest year in 2012. Those drastic production differences resulted in prices paid by shellers for Runners increasing from $448 per ton to $736 per ton in just three years. Runner NPPs soared to over $1,200 per ton in 2011. These high prices

and great volatility made it difficult for Defendants and McCleskey Mills to manage risk and plan for production with such massive price changes in such a short period of time.  Defendants and McCleskey Mills were also reluctant to offer higher prices to avoid encouraging increased plantings for the next season because their purchasers prefer fresh and current Peanuts, rather than Peanuts that shellers have stored for an entire season.  Therefore, going forward, Defendants and McCleskey Mills operated in a coordinated and lockstep manner, even when doing so was contrary to each one's independent economic self-interest.

94.     For instance, and on information and belief, in 2016, Defendants each reported overestimated Peanuts inventory numbers to the USDA to fuel fears of an oversupplied market, causing artificially low Peanut and Runner prices paid to farmers.  At the very least, Defendants knew the Peanuts inventory numbers were overstated based upon their inside knowledge, communicated about that overstatement directly with each other, and kept that information secret from Peanut farmers.  As discussed earlier in this Complaint, the USDA's July 2016 Peanut Stocks and Processing report was found to have "grossly overstated" the Peanut supply by more than 750,000 tons.  This overstatement was a huge adjustment that cost farmers.  In reality, there was no such oversupply; in fact, some warehouses had already shelled out of the previous year's crop by late summer.  *The Peanut Grower* reported that it was "clear peanuts are likely to be short before the next harvest," and this overstated inventory "may impact the growth and expansion of the U.S. peanut industry for years."

95.     As previously discussed, NASS price and inventory data are gathered from shellers on a voluntary and confidential basis, making the data unverifiable and vulnerable to inaccuracies. Defendant shellers Golden Peanut, Birdsong and Olam had the means and opportunity to manipulate and coordinate their inventory reports to suppress Peanut prices.

28

96.     The overstated inventory reports in July 2016 were concerning enough that the USDA held an educational seminar in December 2016 with the American Peanut Shellers Association to instruct shellers "how to properly fill out the required forms."

97.     Defendants in 2016 also each capitalized on the fear of oversupply they had orchestrated by coercing farmers into signing shelling contracts at a low price of approximately $375 per ton.  In January and February 2016, executives from each of the Defendants attended industry meetings in January 15-18, 2016 (PTNPA) and February 12-15, 2016 (NPBPA).  During this same period, there were more than a dozen telephone calls between Defendants Olam, Birdsong and Golden Peanut.  As is the case every year, all three Defendants then announced a price of $375 per ton on the same day in spring 2016.  Defendants all informed farmers they would not be able to sell their Peanuts or find a storage warehouse if farmers waited to contract later in the production cycle or after harvest—when Defendants knew in reality there would be warehouses available.  Defendants urged farmers to sign contracts before planting for the 2016 crop even began.  In addition, Defendants offered this artificially low price knowing farmers need a contract in place to secure the $355 federal loan rate as well as to obtain other agricultural loans from banks.  Defendants also offered nominal so-called "I love you money" loyalty payments of approximately $20-40 per ton to farmers to encourage early contracting.  These coordinated tactics deprived farmers of higher Peanut prices that would have otherwise resulted from the tight supply that was actually the reality for 2016.

98.     In fact, Defendants use their option contracts as a means to limit the negotiating power and pricing options for farmers.  Upon information and belief, Defendants release nearly identical contracts typically within the same day of one another.  These contracts are released

following National Peanut Buying Points Association conferences, which are sponsored and attended by both Golden Peanut and Birdsong.

99.     Defendants' actions have the intended purpose and effect of depressing the price of Runner Peanuts purchased from Plaintiffs and class members.

## VII.    CLASS ACTION ALLEGATIONS

100.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

> All farmers who sold Runner Peanuts to Defendants or their co-conspirators in the United States from at least as early as January 1, 2014 until the present. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

101.     **Class Period:** The Class Period is presently defined as January 1, 2014, through the present. Additional discovery may reveal that the conduct alleged in this Complaint commenced at an earlier time, and Plaintiffs reserve all rights to amend this complaint as appropriate.

102.     **Class Identity:** The Plaintiff Class is readily identifiable and is one for which records should exist.

103.     **Numerosity:** Plaintiffs do not know the exact number of Class members because such information presently is in the exclusive control of Defendants, due to the privatized nature of Peanut transactions between shellers and farmers. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

104.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class members of the Plaintiff Class because Plaintiffs sold Runners directly to one or more of the Defendants for shelling, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

105.    **Common Questions Predominate:** There are questions of law and fact common to the Class, including, but not limited, to:

A.    Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, depress, maintain, or stabilize prices of Runners purchased in interstate commerce in the United States;

B.    The identity of the participants of the alleged conspiracy;

C.    The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

D.    Whether the alleged conspiracy violated the federal antitrust laws;

E.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and other members of the Class;

F.    The effect of Defendants' alleged conspiracy on the prices of Runners sold in the United States during the Class Period;

G.    Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

H.    The appropriate class-wide measure of damages.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

106.    **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly sold Peanuts to Defendants, and Plaintiffs have retained counsel competent

and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

107.    **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all damaged Class members is impractical.  Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

108.    The Class is readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

109.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

110.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.   ANTITRUST INJURY

111.    Defendants' anticompetitive conduct had the following effects, among others:

A.    Competition among Defendants for prices paid to Class members has been restrained or eliminated with respect to Runners;

  B. The prices of Runners paid to Class members have been fixed, depressed, stabilized, or maintained at artificially low levels; and

  C. Peanut farmers have been deprived of free and open competition.

112. During the Class Period, Plaintiffs and members of the Class were artificially underpaid by Defendants for their Runner Peanuts.

113. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having been paid lower prices for Runner Peanuts than they would have been paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages.

114. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX. ACTIVE CONCEALMENT

115. Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief.  Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.  Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for Runners.

116. Throughout the Class Period set forth in this Complaint, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and Class members.

117. The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of telephone or in-person meetings

at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor or supply restraint communications on documents, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including peanut farmers).   The conspiracy was by its nature self-concealing.

118.   As alleged above, in 2014, after years of boom and bust cycles of production leading to the regular rise and fall of prices, Runner prices became unprecedentedly low and stagnant, which continues through the filing of this Complaint.   Defendants, through public statements, affirmatively and falsely attributed the price decrease and stagnation to an "oversupplied" and "quiet" market, among other reasons.   In October 2014, Golden Peanut also claimed "[p]rices have actually risen in this quiet market," but explained "it is just that a lack of activity has not given the market the full opportunity to show the full impact of the different issues affecting the market."   These statements were pretexts used to cover up the conspiracy; Defendants affirmatively made these misleading statements during the relevant period to falsely portray a competitive market for Peanuts and Runners, when in fact, these price decreases were the result of collusive conduct between Defendants, which was undisclosed at the time.   Defendants' statements were particularly effective as pretexts for their collusive conduct, given the record high Peanuts harvest just two years earlier in 2012.

119.   Not until after Hurricane Michael struck on October 10-11, 2018 were Plaintiffs even *potentially* on notice that such price-fixing was possibly taking place. The USDA's NASS inventory reports reflected an oversupply of Peanuts, and Peanut and Runner prices hardly changed for the 2018-2019 production year, despite the hurricane hitting the top Peanut-producing states, Florida, Georgia, and Alabama, during the middle of harvest season.   In fact, Hurricane Michael,

as a Category 5 hurricane (the maximum rating on the Saffir-Simpson Hurricane Wind Scale) was the strongest hurricane on record to make landfall in the Florida panhandle and the first major hurricane to directly hit Georgia since the 1890s.  The storm pushed back the harvest timeline, causing crop loss due to over-maturity as well as causing disease because farmers could not spray or dig the crop during the storm.  Georgia suffered an estimated loss of $10 to $20 million to its Peanut crop, Florida suffered an estimated loss of $23 million, and Alabama suffered an estimated loss of $11.3 million.  The storm also affected critical infrastructure such as farm equipment, drying facilities, warehouses, and power lines.

120.    The apparent disconnect between Hurricane Michael's catastrophic effects and Runner prices and inventory levels, coupled with the unchanging prices in 2016-2017 despite severe weather at that time, led Plaintiffs to begin investigating the legitimacy of Defendants' Runner prices.

121.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Peanuts are not exempt from antitrust regulation, and thus, before mid-October 2018, Plaintiffs reasonably considered it to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Runner prices before mid-October 2018 when the USDA reported high Peanut and Runner inventory levels even after Hurricane Michael struck the top three Peanut-producing states in the country.

122.    Plaintiffs exercised reasonable diligence.  Plaintiffs and the members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

123.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

**CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1**
**(ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE**
**RELIEF)**

124.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

125.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 2014 (further investigation and discovery may reveal an earlier date), and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, depress, stabilize, and peg prices for Runner Peanuts in the United States, in violation of Section I of the Sherman Act, 15 U.S.C. § 1.

126.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: fixing, depressing, stabilizing, and pegging the price of Runners.

127.    The combination and conspiracy alleged herein has had the following effects, among others:

A.    Price competition in the purchase of Runners has been restrained, suppressed, and/or eliminated in the United States;

      B.    Prices for Runners sold to Defendants and all of their co-conspirators have been fixed, depressed, maintained, and stabilized at artificially low, noncompetitive levels throughout the United States; and

      C.    Those who sold Runners directly to Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

128.    Plaintiffs and members of the Class have been injured and will continue to be injured in their businesses and property by being paid less for Runners sold directly to Defendants and their co-conspirators than they would have been paid and will be paid in the absence of the combination and conspiracy.

129.    Plaintiffs and members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### REQUEST FOR RELIEF

130.    WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

131.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

132.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

133.    Plaintiffs and the Class recover damages, to the maximum extent allowed under the Sherman Act, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled;

134.    Defendants, their affiliates, successors, transferees, assignees and other officers,

directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

135.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

136.    Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

137.    Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

138.    Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**JURY TRIAL DEMANDED**

139.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED this 27th day of May 2020.

By _/s/ Wyatt B. Durrette_
Wyatt B. Durrette, Jr., Esquire (VSB No. 04719)
Kevin J. Funk, Esquire (VSB No. 65465)
DURRETTE, ARKEMA, GERSON & GILL PC
1111 East Main Street, 16th Floor
Richmond, Virginia 23219
Tel:  (804) 775-6900
Fax:  (804) 775-6911
wdurrette@dagglaw.com
kfunk@dagglaw.com

**_Counsel for Plaintiffs and Interim Liaison_**
**_Counsel for the Proposed Class_**


W. Joseph Bruckner (MN No. 0147758)
(admitted _pro hac vice_)
Brian D. Clark (MN No. 00390069)
(admitted _pro hac vice_)
Simeon A. Morbey (MN No. 0391338)
(admitted _pro hac vice_)
Stephanie A. Chen (MN No. 0400032)
(admitted _pro hac vice_)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com
sachen@locklaw.com


Kimberly A. Justice (PA No. 85124)
(admitted _pro hac vice_)
Jonathan M. Jagher (PA No. 204721)
(admitted _pro hac vice_)
FREED KANNER LONDON & MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6487
Fax: (224) 632-4521
kjustice@fklmlaw.com
jjagher@fklmlaw.com

Douglas A. Millen (IL No. 6226978)
(admitted *pro hac vice*)
Michael E. Moskovitz (IL No. 6237728)
(admitted *pro hac vice*)
Robert J. Wozniak (IL No. 6288799)
(admitted *pro hac vice*)
Brian M. Hogan (IL No. 6286419)
(admitted *pro hac vice*)
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, #130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Fax: (224) 632-4521
dmillen@fklmlaw.com
mmoskovitz@fklmlaw.com
rwozniak@fklmlaw.com
bhogan@fklmlaw.com

**Counsel for Plaintiffs and Interim Co-Lead Counsel for the Proposed Class**

Jeffrey J. Corrigan (NY No. 2372654)
(admitted *pro hac vice*)
SPECTOR ROSEMAN & KODROFF, P.C.
Two Commerce Square
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Fax: (215) 496-6611
jcorrigan@srkattorneys.com

**Additional Counsel for Plaintiffs and the Proposed Class**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically e-mail notification of such filing to all counsel of record.

To the best of my knowledge, there are no other attorneys or parties who require service by U.S. Mail.

_/s/   Wyatt B. Durrette, Jr._____
Wyatt B. Durrette, Jr., Esquire (VSB No. 04719)
DURRETTE, ARKEMA, GERSON & GILL PC
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Tel:  (804) 775-6900
Fax:  (804) 775-6911
wdurrette@dagglaw.com