

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

D&M FARMS, MARK HASTY, DUSTIN
LAND, ROCKY CREEK PEANUT FARMS,
LLC, DANIEL HOWELL, and, LONNIE
GILBERT, individually and on behalf
of all others similarly situated;

   Plaintiffs,

v.             CIVIL ACTION NO. 2:19-cv-463

BIRDSONG CORPORATION, GOLDEN
PEANUT COMPANY, LLC, and OLAM
PEANUT SHELLING COMPANY, INC.

   Defendants.

*MEMORANDUM OPINION AND ORDER*

  Before the Court is a Motion for Class Certification filed by Plaintiffs D&M FARMS, MARK HASTY, DUSTIN LAND, ROCKY CREEK PEANUT FARMS, LLC, DANIEL HOWELL, and LONNIE GILBERT, individually and on behalf of all others similarly situated (collectively "Plaintiffs"). ECF No. 235. The Court has also reviewed Defendants BIRDSONG CORPORATION, GOLDEN PEANUT COMPANY, LLC, and OLAM PEANUT SHELLING COMPANY, INC.'s (collectively "Defendants") Memorandum in Opposition, and Plaintiffs' Reply. ECF Nos. 259, 271. Upon review of the relevant filings, the Court finds that a hearing on Plaintiffs' Motion is not necessary and therefore denies Defendants BIRDSONG CORPORATION and OLAM PEANUT SHELLING COMPANY, INC.'s Request for Hearing. ECF No. 276. For the reasons stated herein, Plaintiffs' Motion for Class Certification is **GRANTED.**

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiffs filed their initial complaint on September 5, 2019. ECF No. 1. Since initiating the present lawsuit, Plaintiffs filed a Second Amended Class Action Complaint (the "Complaint") on May 27, 2020. ECF No. 148. Plaintiffs are a group of peanut farmers who sell raw, harvested runner peanuts to the Defendants (also known as "shellers") to be processed and sold to food companies or other manufacturers. *Id.* at 1. From approximately 2011 to 2013, "the Peanut industry experienced drastic weather-related price changes that made it difficult for Defendants […] to manage risk and plan for production." *Id.* at 2. Since in or around January 2014, "the prices paid by shellers to Peanut farmers for Runner[] [peanuts] have remained remarkably flat and unchanged, despite significant supply disruptions" such as hurricanes. *Id.* Because of this significant difference in pricing norms within the industry, Plaintiffs accuse Defendants of "conspir[ing] and collud[ing] with one another to stabilize and depress Runner [peanut] prices." *Id.*

According to the Complaint, Defendants have used their 80–90% market share in the peanut selling industry to facilitate a price fixing conspiracy to depress the price of runner peanuts. *Id.* at 1. Plaintiffs seek a single claim for relief, on behalf of a nationwide class, under Section 1 of the Sherman Antitrust Act. *Id.* at 36. The purported class includes "[a]ll farmers who sold Runner Peanuts to Defendants or their co-conspirators in the United States from at least as early as January 1, 2014 until the present." *Id.* at 33. Specifically excluded from the purported class are any "Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. *Id.*

Plaintiffs filed their Motion for Class Certification on September 4, 2020. ECF No. 235.

Defendants filed a Memorandum in Opposition on September 25, 2020. ECF Nos. 257, 259. Plaintiffs filed their Reply on October 2, 2020. ECF No. 271. Accordingly, this matter is ripe for judicial determination.

## II. LEGAL STANDARD

In order to certify a suit as a class action, the proponent of class certification has the burden of establishing that the conditions enumerated in Rule 23 of the Federal Rules of Civil Procedure have been met. *Windham v. American Brands, Inc.*, 565 F.2d 59, 64 n.6 (4th Cir. 1977) (en banc) *cert. denied*, 435 U.S. 968, 56 L. Ed. 2d 58, 98 S. Ct. 1605 (1978). Rule 23 provides, in pertinent part:[1]

> **(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> **(b) Class Actions Maintainable.** An action may be maintained if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> ...
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

---

[1] A proponent of class certification must meet all of the requirements of Rule 23(a), and satisfy one of the subsections of Rule 23(b). Plaintiffs have moved for class certification pursuant to 23(b)(3). *See* ECF No. 236.

FED. R. CIV. P. 23. The Court must conduct a "rigorous analysis" in determining whether the requirements of Rule 23 have been met. *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982). Whether the proponent of certification has met his or her burden is left to the trial court's discretion and will be reversed only for abuse of such discretion. *Windham*, 565 F.2d at 65. In conducting its rigorous analysis of Rule 23, the Court must take a "close look at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." *Thorn v. Jefferson—Pilot Life Ins. Co.*, 445 F. 3d 311, 319 (4th Cir. 2004) (internal quotations omitted). "Such findings can be necessary even if the issues tend to overlap into the merits of the underlying case." *Id.*

### III. DISCUSSION

In order to conduct a sufficient analysis of Plaintiffs' Motion, the Court must apply relevant facts within Plaintiffs' Complaint to Rule 23(a) and (b). Importantly, Defendants do not contest Plaintiffs' assessment of the four requirements under Rule 23(a). The Court will nonetheless quickly evaluate Plaintiffs' allegations under Rule 23(a). Defendants do, however, ardently contest the applicability of Rule 23(b)(3), arguing that common questions do not predominate because Plaintiffs are not similarly situated and cannot rely upon common evidence. The following analysis addresses the Rule 23 class action requirements in turn.

#### A. Rule 23 (a)

##### 1. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." This Court, among others, has previously held that "classes consisting of forty or more members are considered sufficiently large to satisfy the impracticability requirement." *American Sales Company, LLC v. Pfizer, Inc.* 2017 WL 3669604, at *6 (E.D. Va. July 28, 2017);

*see, e.g., Meijer, Inc. v. Warner Chilcott Holdings Co. III., Ltd.*, 246 F.R.D. 293, 301 (D.D.C. 2007) (quoting *Thomas v. Christopher*, 169 F.R.D. 224, 237 (D.D.C. 1996)) (finding the numerosity requirement satisfied by a class of thirty members).

Here, Plaintiffs purport to represent "almost 12,000 farmers that are geographically dispersed across the Southern and Southeastern U.S." ECF No. 241 at 12. Defendants do not challenge Plaintiffs purported class size. Accordingly, the Court finds that the numerosity requirement is satisfied.

### 2. *Commonality & Typicality*

The commonality and typicality requirements tend to merge. While Rule 23(a)(2) requires that questions of law or fact be common to the class, Rule 23(a)(3) similarly requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). "A common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees." *Thorn*, 445 F.3d at 318. In the antitrust context, courts have generally held that an alleged conspiracy or monopoly is a common issue that will satisfy Rule 23(a)(2) as the singular question of whether defendants conspired to harm plaintiffs will likely prevail. *See, e.g., Meijer*, 246 F.R.D. at 300; *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2011 WL 3563385, at *4 (E.D. Pa. Aug. 11, 2011).

Meanwhile, typicality ensures that "only those plaintiffs who can advance the same factual and legal arguments may be grouped together as a class." *Brousard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998). Additionally, "typicality 'will be established by

5

plaintiffs and all class members alleging the same antitrust violations by defendants.'" *Pfizer, Inc.*, 2017 WL 3669604, at *11 (quoting *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002)). Here, Plaintiffs allege that Defendants took part in a conspiracy to depress the price of runner peanuts from January 2014 to present. *See* Compl. Because this alleged conspiracy is part and parcel to a single antitrust violation, Plaintiffs' claims are also typical among the class. *See In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260 ("The typicality requirement is satisfied if each class member's claim arises from the same course of events that led to the claims of the representatives parties and each class member makes similar legal arguments to prove the defendant's liability." (internal quotations omitted)). Accordingly, the purported class meets the commonality and typicality requirements of Rule 23(a).

### 3. Adequate Representation

The final requirement of a Rule 23(a) analysis necessitates that the named plaintiffs, and their counsel, fairly and adequately protect the interests of the purported class. Plaintiffs must demonstrate that the named plaintiffs and putative class will "share common objectives and the same factual and legal positions," ensuring that there are no "fundamental" conflicts that go to the "heart of the litigation." *Gunnells v. Healthplan Sers., Inc.*, 348 F.3d 417, 430-31 (4th Cir. 2003).

Here, Plaintiffs are a group of peanut farmers who sell raw, harvested runner peanuts to the Defendants. Plaintiffs seek to represent a class of peanut farmers who have also sold runner peanuts to Defendants. Plaintiffs, and the purported class, seek to recover damages pursuant to conduct allegedly in violation of the Sherman Act. Notably, Defendants do not challenge the adequacy of Plaintiffs or Plaintiffs' counsel. Upon review, the Court finds no evidence to suggest that the interests of the named Plaintiffs in any way contradict that of the purported class. The same goes for Plaintiffs' counsel. Accordingly, requirement four of Rule 23(a) is met and Rule

23(a) is satisfied in its entirety.

## B. Rule 23(b)(3) Certification

An assessment of Rule 23(b)(3) is where the parties disagree. Under Rule 23(b)(3), common questions of law or fact "must predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Further, a plaintiff must establish "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* These requirements are commonly referred to as the *predominance* and *superiority* requirements of a Rule 23(b)(3) analysis.

The predominance requirement establishes a separate and "more stringent" analysis than Rule 23(a)'s commonality requirement. *Thorn*, 445 F.3d at 319 (quoting *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001)); cf. Fed. R. Civ. P. 23(a)(2) (requiring only the presence of common questions of law or fact). Predominance of common questions over individual issues ensures that the "proposed class[] [is] sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 623 (1997). "If the 'qualitatively overarching issue' in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues." *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D 183, 214 (E.D. Va. 2015) (citing *Ealy v. Pinkerton Gov't Servs.*, 514 F. App'x 299, 305 (4th Cir. 2013)); *see also* Namenda, 331 F. Supp. 3d at 204 ("'[I]ndividual questions need not be absent' in order to certify a class under Rule 23(b)(3); the text of Rule 23(b)(3) itself contemplates that such questions will be present." (quoting *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015))).

In order to satisfy the predominance requirement, a plaintiff must demonstrate that each element of the legal claim "is capable of proof at trial through evidence that is common to the class rather than individual." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311. "Because the

nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Id.* (internal quotations and citations omitted). Accordingly, the Court must conduct a "rigorous analysis" of the Rule 23(b)(3) requirements, establishing various facts in support of such analysis. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 323–24. In so doing, the Court is required to evaluate "Plaintiffs' methodology for proving [predominance and superiority] and must act as finder of fact in the face of conflicting expert testimony." *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. at 340.

### *1. Factual Findings Relevant to Plaintiffs' Motion*

#### *a. Facts Relevant to Alleged Violations of the Sherman Act § 1*

As previously articulated, Plaintiffs seek to represent a class of "almost 12,000 farmers that are geographically dispersed across the Southern and Southeastern U.S." ECF No. 241 at 12; ECF No. 259 at 8. Plaintiffs individually sold runner peanuts to one or more of the Defendants during the proposed class period—January 1, 2014 through the present. Compl. ¶ 19-25. Plaintiffs accuse Defendants of artificially depressing the price of runner peanuts, causing peanut farmers to receive below market payments in exchange for their product. *See* Compl.

In support of Plaintiffs' theory of liability, Plaintiffs rely upon experts, documents, depositions, and various conversations exchanged between Defendants' employees. As one such offer of proof, Plaintiffs rely upon the expert report of Dr. Michael A. Williams, Ph. D. ECF No. 237-1. In his report, Dr. Williams sets forth market research demonstrating a likelihood that Defendants conspired to commit antitrust violations. *Id.* As a part of his report, Dr. Williams conducts a market structure analysis in which he concludes that throughout the relevant class

period, there existed (1) high buyer concentration in the peanut market, (2) antitrust barriers to entry in the peanut shelling market, (3) a commodity-like nature for runner peanuts, (4) a large number of repeat sales to the same shellers, (5) relatively low elasticity of supply, and (6) various industry trade associations. *Id.* Dr. Williams argues that taken together, these six factors support a likelihood of collusion and, thus, unlawful price-fixing. *Id.*

Upon review, Defendants' only challenge to Dr. Williams' market structure analysis is that he lacks "any empirical analysis whatsoever," without describing what information is lacking and without pointing to a counter argument or rebuttal testimony to that effect. ECF No. 259 at 14. The Court, however, finds Dr. Williams' market structure analysis to contain plausible evidence in support of an alleged conspiracy. Arguments (1), (2), and (4) are supported by the mere fact that Defendants occupy 80-90% of the market share for peanut shellers. Accordingly, it is very likely that high buyer concentration, barriers to market entry, and a large number of repeat sales exist since there are so few market competitors. Further, argument (3) is plausible since the Agricultural Act of 2014 (the "2014 Farm Bill") (a bill that was repeatedly referenced in Defendants' Memorandum in Opposition) identifies peanuts as a "covered commodity" under various provisions of the Bill. *See* ECF No. 237-1. Dr. Williams also relies upon seemingly trustworthy sources in support of arguments (5) and (6). *Id.* at 24-28.

Plaintiffs further allege that additional evidence of collusion will flow from emails, phone records, and deposition testimony establishing "internal emails in which senior Defendant executives passed competitive pricing information to top management shortly after... texts and/or phone calls with competitors." ECF No. 236 at 10. So far, Plaintiffs have taken five depositions in addition to having "roughly 25 [more depositions] scheduled or being scheduled." *Id.* Plaintiffs have also obtained various communications in which Defendants discuss pricing for the upcoming

buying season. *Id.* at 11. For example, one such email from an employee at Defendant Olam to an employee at Defendant Birdsong reads "[i]t is always a pleasure to break bread together and talk about the industry and where we are and where we are going." *Id.*; *Id.* at Ex. 4. In another email, an employee from Defendant Golden Peanut contacted an employee from Defendant Birdsong asking "[w]hat are you paying for Seg 2 & 3?" to which the Birdsong employee responded "175." ECF No. 236 at 12; *Id.* at Ex. 8. In another internal email between Defendant Golden Peanut's employees, one such employee acknowledges that Defendant Olam has set a purchase price for one of its products at "$400 for 2016 in all areas according to a usually reliable source." *Id.* at 12; *Id.* at Ex. 9. Plaintiffs refer to a litany of similar emails, deposition testimony, and other documents in support of potential collusion. *See* ECF No. 236 at 10-18. Additionally, after he reviewed these emails, among other documents, Dr. Williams further determined that the peanut industry is ripe for collusion since the communications reflect actions against Defendants' individual self-interests, but in favor of the alleged conspiracy. ECF No. 237-1.

Defendants do not challenge the validity of the emails, and other documents; however, Defendants do argue that the information exchanged therein "do[es] not violate the Sherman Act." ECF No. 257 at 13; *see also id.* at 33-35. Instead, the communications were byproducts of "legitimate business relationships[,]… all of which are lawful." *Id.* at 34. While this conclusion remains to be seen, the underlying facts (i.e. the emails and other documents) are not in dispute and will be accepted as true for the limited purposes associated with this Memorandum Opinion and Order.

### b. *Facts Relevant to Antitrust Impact*

Assuming the alleged conspiracy occurred, Plaintiffs argue that the impact of this conspiracy permeates throughout the purported class. The parties almost entirely rely upon their

expert opinion reports to evaluate the impact of the alleged conspiracy on the class. In support of Plaintiffs' Motion, Dr. Williams conducts a two-part analysis. First, he assesses "whether common evidence and analyses can be used to determine whether the alleged conspiracy deflated prices to the Class below competitive levels in general." ECF No. 237-1 at 44-45. This assessment was previously addressed in Section III.B.1.a. Second, Dr. Williams assessed "whether common evidence and analysis can be used to determine whether any such general price deflation would have a widespread effect on Class members, causing all or virtually all of them to receive a lower payment for at least one sale of Runner peanuts than they would have received but for the alleged conspiracy." *Id.* This assessment will be analyzed as follows.

Dr. Williams' two-part inquiry makes use of a multiple variable regression model. ECF No. 237-1 at 45. The multiple variable regression model compares "prices during the period effected by the alleged unlawful conduct... to competitive prices during a 'benchmark' period, i.e., prices in a market or during a time period likely unaffected by the alleged unlawful conduct." *Id.* In making this comparison, the model can demonstrate what the price for runner peanuts would have been absent the conspiracy. *Id.* This establishes a "but-for" price for the runner peanuts which is a widely used plaintiffs' tactic in antitrust, horizontal price fixing cases. *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D at 345; *see also In re EPDM Antitrust Litig.*, 256 F.R.D. 82, 88 (D. Conn. 2009); *In re Rail Freight*, 287 F.R.D. at 44. Additionally, Dr. Williams' regression model was used to compare the actual prices of Defendants' runner peanuts with the "but-for" price, determining that 99.8% of the purported class had been affected by the alleged conspiracy. ECF No. 237-1 at 58.

Dr. Williams' regression model "employs econometric methods to account for factors that affect prices but that are unrelated to collusion (e.g., cost and demand factors) to isolate the price

effects, if any, of the alleged conspiracy." *Id.* Dr. Williams also accounts for fixed price effects such as the calendar month, each Defendant, transaction type, region, peanut segregation, high-oleic indicator, seed indicator, pool contract indicator, and farmer. *Id.* at 57. By using this method, Dr. Williams determined that Defendants' "alleged conspiracy depressed farmer stock runner peanut prices below competitive levels by 18.1%." *Id.* at 58.

Defendants, and Defendants' expert Dr. Michelle Burtis, disagree with Dr. Williams' findings. According to Defendants, Dr. Williams does not account for the specific instances during the class period in which Defendants allegedly colluded. ECF No. 259 at 20-23. In other words, Defendants intend to discredit Dr. Williams' assessment based upon alleged overinclusion of alternative factors that would impact price – those other than a conspiracy. *Id.* Defendants argue that in so doing, "he attributes any and all prices differences [sic] between his benchmark period and the proposed Class period to 'the alleged conspiracy.'" *Id.* at 22 (internal citations omitted).

Defendants further accuse Plaintiffs of relying upon averages attributable to the entire class instead of those applicable to each proposed class member equally. Defendants argue that "[r]ather than designing a model that is capable of proving whether each of these different proposed class members was impacted by the alleged conduct, Dr. Williams created a model that manufactures common impact by applying the same average underpayment rate to all growers." *Id.* at 23. (emphasis omitted). Additionally, Defendants allege that Dr. Williams' method produces false positives and includes a number of uninjured Plaintiffs. *Id.* at 28-29 and 31-33. According to Dr. Burtis, Dr. Williams' conclusion that 99.8% of the class was impacted yields an error that could range from at least 50% to as high as 97%. *Id.* at 29; ECF No. 259-2.

The Court will consider these facts in its Predominance analysis below.

## 2. *Predominance*

To succeed on their antitrust claim at trial, Plaintiffs must establish the following elements: (1) a violation of the applicable antitrust laws, (2) individual injury, or antitrust impact, and (3) measurable damages. *See* 15 U.S.C. § 15; *Am. Sales Co.*, 2017 WL 3669604, at *13. While Defendants do not concede to any violation of the applicable antitrust law– *i.e.* Section One of the Sherman Act– Defendants primarily contest Plaintiffs' ability to prove elements two and three of their antitrust claim. ECF No. 259 at 20. The Court, however, will examine each element herein.

### *a. A Violation of Section One of the Sherman Act*

In alleging that Defendants committed antitrust violations, Plaintiffs have proven that common issues of law and fact clearly predominate over individual issues. Plaintiffs set forth a myriad of common evidence such as emails, conversations, and deposition testimony in which Defendants discuss competitors' prices in a manner that can be perceived as a means to collude. Fatally, Dr. Williams conducts a market structure analysis in which he concludes that throughout the relevant class period, there existed (1) high buyer concentration in the peanut market, (2) antitrust barriers to entry in the peanut shelling market, (3) a commodity-like nature for runner peanuts, (4) a large number of repeat sales to the same shellers, (5) relatively low elasticity of supply, and (6) various industry trade associations. *Id.* While the court will not assess the weight of these factors to establish any sort of liability, the factors certainly predominate the class. Importantly, if true, each factor impacts the price of runner peanuts which of course effects the vast majority, if not all, of the purported class. Defendants have not provided enough evidence to undermine or negate the Courts reliance on Plaintiffs' cited emails and Dr. Williams' market structure analysis. Accordingly, common issues of law and fact predominate with respect to proving violations of the Sherman Act.

### *b. Individual Injury and/or Antitrust Impact*

"It is a basic tenet of antitrust law that a cause of action will not lie if the plaintiff has not been harmed." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 92 (3d Cir. 2011). Therefore, only those who have suffered injury "by reason of anything forbidden in the antitrust laws" may bring a suit for treble damages. 15 U.S.C. § 15(a). "[Antitrust] impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *Hydrogen Peroxide*, 552 F.3d at 311. Importantly, at the class certification stage, Plaintiffs need only demonstrate, by a preponderance of the evidence, "that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Hydrogen Peroxide*, 552 F.3d at 311-12. Accordingly, to meet their burden, Plaintiffs must demonstrate that through evidence common to the class, the proposed class received a lower price for runner peanuts than they would have received absent the alleged conspiracy. *See Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481, 489 (1968).

As discussed in detail above, Plaintiffs rely upon Dr. Williams' expert report to prove class-wide impact. Therein, Dr. Williams concludes that "approximately 99.8% of [the proposed class] had at least one underpayment observation during the Class Period." ECF No. 237-1 at 62. In getting to this conclusion, Dr. Williams uses a multiple variable regression model to conclude that approximately 12,000 farmers were potentially underpaid as a result of the alleged conspiracy. *Id.* A variation of that regression model further established a "but-for" price, indicating what farmers would have been paid for their runner peanuts but for the alleged conspiracy. Dr. Williams then took the actual prices paid to each of the farmers, compared those prices to the "but-for" prices, and found that 99.8% of the proposed class had at least one underpayment observation during the

class period.

Courts have held that determining class-wide impact via an economic regression model is sufficient to withstand a predominance analysis. *In re EPDM Antitrust Litig.*, 256 F.R.D. at 88 ("[O]ne way of demonstrating predominance is to show that there is a common method for proving that the class plaintiffs paid higher actual prices than in the but-for world, such as using an econometric regression model."); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. at 345; *In re High-Tech Employee Antitrust Litig.*, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014). On the other hand, some courts have rejected regression models where the variables undergirding the regression analysis were not sufficiently tailored to the liability at issue. *See Comcast Corp v. Behrend*, 569 U.S. 27 (2013); *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, (8th Cir. 2019). Here, Dr. Williams' regression model spans the relevant Class period (January 1, 2014 to December 31, 2019), separates and accounts for variables unrelated to Plaintiffs' theory of liability (such as the farmers' costs associated with production and prices for peanut butter sales), and utilizes fixed effect variables to ensure consistency. *See supra* III.B.1.a. Defendants argue, however, that the regression model: (1) is over inclusive as it does not consider alternative variables that may have impacted the price of Runner peanuts, (2) does not properly account for the different contracts each Defendant may have had with members of the proposed class, (3) does not account for the impact of the 2014 Farm Bill, (4) does not account for each individual occurrence attributable to the conspiracy (i.e., each email or other communication), and (5) produces false positives. ECF No. 259 at 9-12, 20-31.

In taking all of Dr. Williams alleged missteps into consideration, Defendants argue that Dr. Williams improperly establishes a general, average rate of underpayment and applies this rate to the entire class to prove impact. Specifically, Defendants argue that Dr. Williams improperly uses

15

a single average percentage rate for underpayment and imputes this percentage across the class without applying an individual assessment for impact to each individual member of the Class. This Court, however, has previously found that "[i]t is a common practice to use averages to determine whether class members suffered a common antitrust injury in cases such as this one, even if the damages calculation, which occurs later in the proceedings, will require a more individualized inquiry." *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18cd2836 (E.D. Va. Aug. 21, 2020).

Importantly, "[t]he real question before the court is whether the plaintiffs have established a workable multiple regression equation, not whether plaintiffs' model actually works." *In re EPDM Antitrust Litig.*, 256 F.R.D. at 100. "[T]he issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove [class-wide impact.]" *Id.* Accordingly, the Court declines to weigh the strength of Defendants' arguments against Dr. Williams' multiple variable regression model as the Court believes such a determination should be made by the appropriate fact finder. The Court will instead consider whether Dr. Williams' multiple variable regression model, as written, is a viable means to assess impact. Because the model can account for non-conspiracy-related variables that may have contributed to Runner prices such as cost and demand, the time of year, specifics attributable to each Defendant, the transaction type, region, etc., the Court is confident that other variables can be examined as the parties discover which variables apply to the facts of the alleged conspiracy. Therefore, the Court finds that Dr. Williams' regression model can reasonably serve as the basis to determine class-wide impact.

### c. Measurable Damages

At the class certification stage, Plaintiffs must show, by a preponderance of the evidence, that they will be able to prove damages using common proof. *See Behrend v. Comcast Corp.*, 655

F.3d at 204. However, "[s]ome variation of damages among class members does not defeat class certification." *Id.*; *see* 7AA Federal Practice & Procedure § 1781 ("[I]t uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate."). But notably, "[c]omplex and individualized questions of damages... weigh against finding predominance." *Behrend v. Comcast Corp.*, 655 F.3d at 204.

The Court acknowledges that Plaintiffs may be unable to prove class-wide damages without an individualized inquiry as to the damages applicable to each class member. While it is possible that each proposed class member was injured by Defendants' alleged conspiracy, the extent of that injury may differ depending upon the actual Runner peanuts price charged to each Plaintiff and the underlying sales contracts (written or informal) between Defendants and the proposed class members. A potential "need to inquire into individual damage calculations, however, is not an impediment to class certification" since a damages inquiry necessarily requires individual proof. *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. at 349; *see also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 427–28 (4th Cir.2003) ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations.").

Indeed, the Fourth Circuit opined that "Rule 23(c)(4) permits courts to certify a class with respect to particular issues and contemplates possible class adjudication of liability issues with 'the members of the class [that are thereafter] required to come in individually and prove the amounts of their respective claims.'" *Gunnells*, 348 F.3d at 428 (citing Fed.R.Civ.P. 23 advisory committee's note (1966 Amendment, subdivision (c)(4))). Accordingly, should the Court determine that this case requires an alternative mechanism to assess damages – even if the Court

must create subclasses or first assess liability and later conduct damages trials – the Court will do so at a later proceeding, upon completion of discovery.

### 2. *Superiority*

Finally, Plaintiffs must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The superiority requirement ensures that proceeding by class action will "achieve economies of time, effort, and expense, and promote… uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences." *Amchem Prods., Inc.*, 521 U.S. at 615. Plaintiffs have plausibly alleged that approximately 12,000 farmers have been impacted by Defendants' alleged wrongdoing. To resolve these claims, it would require potentially hundreds of minitrials throughout this Circuit and several sister circuits given the geographical location of potential claimants. In the interest of efficiency, time, and uniformity of decision, and because the Court also finds that common issues predominate, class action treatment is superior to any alternative means of adjudication.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Class Certification is **GRANTED**. The Court **ORDERS** certified the following class:

> All farmers who sold Runner Peanuts to Defendants or their co-conspirators in the United States from at least as early as January 1, 2014 until the present. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.

**IT IS FURTHER ORDERED** that Defendants shall provide to Plaintiffs' counsel the names, last known addresses, home and mobile phone numbers, and email addresses of all potential members of the certified class within fifteen (15) days of the date of this Order;

**IT IS FURTHER ORDERED** that Plaintiffs' counsel shall circulate notices of pendency and consent to joinder to all potential members of the certified class upon the Court's approval of the form of notice;

**IT IS FURTHER ORDERED** that any consents to joinder in this action by which additional persons join this litigation as plaintiffs under 29 U.S.C. § 216(b) must be filed with the Clerk of the Court no later than ninety (90) days after either the date that this Court approves the form of notice to the class or the date that Defendants provide to Plaintiffs' counsel the names, last known mailing addresses, home and mobile phone numbers, and email addresses of all potential members of the certified class, which ever date is later.

**IT IS FURTHER ORDERED** that the filing of all dispositive motions shall be **STAYED** until further notice of this Court.

The Court **DIRECTS** the Clerk to provide copies of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED.**

Norfolk, Virginia
December / , 2020

/s/
Raymond A. Jackson
United States District Judge